James G. PIPER, Plaintiff,

v.

L. Watson ANDREWS, Jr., et al.,
Defendants.

Civ. A. No. 2244-59.

United States District Court
District of Columbia.

March 25, 1963.

Landon G. Dowdey, Washington, D. C.,. for plaintiff.

Francis L. Casey, Jr., Hogan & Hartson, Washington, D. C., for defendants..

YOUNGDAHL, District Judge.

The plaintiff recovered a verdict in an action for negligence, and the defendant [1] has moved for judgment notwithstanding the verdict, and in the alternative for a new trial. The grounds for defendant's motion are that the last clear chance doctrine and a portion of the Traffic and Motor Vehicle Regulations for the District of Columbia should not have been submitted to the jury, and that the Court improperly denied the defendant's motion for a mistrial after the plaintiff's attorney made certain statements concerning damages.

1. As far as the last clear chance is concerned, the Court instructed the jury on the elements of this doctrine in the language specifically approved in Mathews v. Lindsay, 108 U.S.App.D.C. 292, 293, 281 F.2d 927, 928 (1960):

"(1) that plaintiff was in a position of danger caused by negligence of both plaintiff and defendant; (2)

---

[1] It was conceded at the trial that although the nominal defendants were the driver of the car and the owner of the car, the case should be considered as if there were only one defendant, since there was no disputed issue of agency between the husband-driver and the owner-wife. For the sake of simplicity, therefore, the Court is referring to the driver when it speaks of the "defendant."

that plaintiff was oblivious of the danger or unable to extricate himself from the position of danger; (3) that defendant was aware or by the exercise of reasonable care should have been aware of plaintiff's danger and obliviousness or inability to extricate himself from the danger; and (4) that defendant with means available to him was by the exercise. of reasonable care able to avoid striking plaintiff after he became aware of the latter's danger and inability to extricate himself from danger, and failed to do so."

There was ample evidence justifying the submission of the last clear chance doctrine, as thus formulated, to the jury. Evidence was introduced to show that the plaintiff was injured as he attempted to walk across Rock Creek and Potomac Parkway between the K Street and Pennsylvania Avenue overpasses on his way to work just before 7:00 a. m. on September 21, 1956. The plaintiff himself testified that he was walking along the east side of the parkway on a bridge, along a pedestrian walkway separated from the roadway by a steel guard rail (called a "parapet" in the testimony); that as he approached the end of the bridge, he looked back over his left shoulder to see if any cars were proceeding north (that is, on his side of the parkway) and that he saw three, which turned off before crossing this bridge; that he looked to his other side and saw a group of cars proceeding south; and that after they passed him, he turned to step into the roadway at the end of the "parapet" to cross the parkway. He remembered nothing further until he was being placed in an ambulance, after admittedly having been struck by defendant's car proceeding north.[2] Thus as far as the plaintiff is concerned, there was evidence from which a jury could reasonably have concluded that the plaintiff was in a position of danger caused by his own negligence and that he was oblivious of the danger.

As far as the defendant is concerned, one witness testified that he saw the defendant's car, a short distance south of the place where the accident occurred, "whiz by" going north; that the defendant's car was going "much faster" than the only other cars present at that moment, which were going south; and that he estimated the defendant's speed at 30 to 35 miles per hour. An expert in estimating traffic speeds and distances placed the defendant's minimum speed at $32\frac{1}{2}$ miles per hour based upon skid marks. There was also testimony that the parkway in the area between the two overpasses had several sharp curves. In addition, there was testimony that the accident occurred shortly before 7:00 a. m., at which time the parkway would become one way only, with all cars proceeding south, and that southbound traffic was already straying over the white line into one of the northbound lanes, creating a special reason for the defendant to hurry. Thus there was evidence from which the jury could reasonably have concluded that the defendant was negligent in operating his car at an unreasonable speed.[3]

This was not all the evidence pointing to the defendant's fault, however. There

2. A doctor testified that the plaintiff was suffering from retrograde amnesia caused by the accident, in which the lapse of memory relates to the period *before* a blow on the head, as well as to the period following such blow.

3. It was agreed between counsel that Rock Creek and Potomac Parkway is under the jurisdiction of the United States Park Police, which has established a legal speed limit of "reasonable speed under circumstances then pertaining." Also conceded to be applicable was § 22(a) of Part I of the Traffic and Motor Vehicle Regulations for the District of Columbia: "No person shall drive a vehicle on a street or highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. In every event speed shall be so controlled as may be necessary to avoid colliding with any person, vehicle, or other conveyance on or entering the street or highway in compliance with legal requirements and the duty of all persons to use due care."

was other evidence showing specifically that the defendant, by the exercise of reasonable care, would have been able to avoid striking the plaintiff after the time when the defendant was aware or should have been aware of the plaintiff's danger and inability to extricate himself therefrom.

The defendant testified that he had driven over this parkway at approximately this time of the morning every weekday for eight or nine months immediately preceding the accident, and that he had never during that time seen any individuals cross the parkway from the north end of the "parapet" to the west side of the road. The plaintiff, in rebuttal, testified that "quite a number" of individuals—at least 15 or 18—walked across the parkway just before and just after 7:00 a. m. every day, on their way to work on the other side. Implicit in the jury verdict is the finding of fact that the defendant was aware, or should have been aware, that people in the plaintiff's position crossed the parkway at that point and at that time in the morning, and that a reasonable person would therefore have proceeded with special caution. This conclusion is bolstered by uncontradicted evidence that the plaintiff would have been seen by an attentive driver of an automobile as he walked along the bridge, next to the parkway. The testimony of the defendant, however, was that he was completely unaware of the plaintiff until the impact occurred.[4] Thus from the evidence the jury could reasonably have concluded not only that the defendant either knew or should have known that individuals in the plaintiff's position crossed the parkway at that point and at that hour, but also that the defendant should have exercised addi-

tional care in anticipation that the plaintiff himself might well try to cross the parkway. Thus the evidence justified the jury in concluding that if the defendant had exercised the care required of a reasonable driver in his position, he would have been aware of plaintiff's danger and obliviousness to such danger in time to sound his horn and to bring his vehicle to a stop before striking the plaintiff. See Capital Transit Co. v. Garcia, 90 U.S.App.D.C. 168, 194 F.2d 162 (1952).

In addition to the above testimony—which alone would have justified an instruction on last clear chance—the plaintiff introduced the testimony of an expert in traffic speeds and distances.[5] The defendant objects to the opinion expressed by such expert to the effect that two and a half seconds elapsed between the moment when the plaintiff left the curb and the moment when he was hit, and that in this time the car could have been brought to a stop before striking the plaintiff. The defendant argues that such a conclusion was improper, because it was based upon two assumptions which were unsupported by the evidence: that the plaintiff was walking at the average speed of pedestrians generally, which the expert estimated at four feet per second; and that the plaintiff was struck in the center of the defendant's car, midway between the two front headlights.[6] There was evidence to support the latter assumption, because a blue mark was discovered upon the car hood near the center, which the jury could reasonably have inferred was the mark left by a small blue box which the plaintiff had been carrying. And although the plaintiff's total absence of memory prevents there being any direct evidence to indi-

4. The defendant testified that he was not sure whether his first knowledge was the feeling of striking something, or the sound of such impact, or seeing something coming over the hood, or seeing the plaintiff immediately before impact.

5. The witness testified that he had been a supervisory sergeant in the accident investigation unit of the District of Columbia Metropolitan Police Force before

becoming a private traffic analyst and consultant, and that he had testified in many cases as an expert on traffic speeds and distances.

6. The other two assumptions which the expert made, and which are not challenged by the defendant, concerned the length of the skidmarks and the estimated speed at which the defendant was driving.

cate that the plaintiff was beginning to *walk* across the parkway rather than to *run* across, the jury could reasonably assume that the plaintiff did the normal thing—walk—in the absence of any evidence to the contrary. He testified that he was "walking" across the bridge just before turning to step onto the parkway. And when the plaintiff testified on rebuttal, he spoke of "quite a number of others" who "walked across" every day at that place; the reasonable inference from this testimony is that the plaintiff himself also usually walked across and that he was following such usual practice on the morning of the accident. The plaintiff's lapse of memory, and the absence of any eyewitnesses, makes any additional evidence on this point impossible to obtain. The inference that the plaintiff was walking is, therefore, simply a reasonable conclusion from all the available facts; such inference is not the result of the kind of speculation on scanty evidence, where more could have been produced, which was held improper in Pennsylvania R. R. Co. v. Pomeroy, 99 U.S.App.D.C. 272, 277–280, 239 F. 2d 435 (1956), upon which the defendant rests his argument.[7]

■ Thus the Court concludes that the last clear chance instruction was properly given to the jury, and that there was substantial evidence on which a reasonable jury could have concluded that the plaintiff proved by a fair preponderance of the evidence each of the four elements of last clear chance.

■ 2. As far as the disputed phrase from the Traffic and Motor Vehicle Regulations of the District of Columbia is concerned, the defendant argues that the Court erred in admitting in evidence and instructing the jury, over defendant's objection, that portion of section 22(c) of such regulations which requires an appropriate reduction in speed when approaching a curve or when traveling upon any winding roadway.[8]

The defendant contends that because the record indicated that there was a curve immediately *north* of the bridge, the regulation requiring a reduced speed was not designed to offer protection to any person injured trying to cross the parkway before the beginning of the curve. The defendant argues that the curve had not yet presented a hazard with respect to this plaintiff, and that the plaintiff cannot therefore claim the protection of that portion of the regulation dealing with curves.

The Court does not agree. A regulation requiring an appropriate reduced speed when approaching and going around a curve is designed as much for the protection of those on the near side of the curve as it is for those on the far side, because the very existence of the

7. In any event, the Court instructed the jury on the usual expert witness rule. Thus the jury was told that it should give careful consideration to the opinion expressed by an expert, in connection with other evidence in the case, and that it should weigh the reasons, if any, given for such opinion. The jury was also told that it was not bound by such opinion, and could give it such weight as the jury deemed it was entitled to receive, whether that be great or slight, and that the jury could reject it completely if in the jury's judgment the reasons given for it were unsound.

8. § 22(c) of Part I of the D.C. Traffic and Motor Vehicle Regulations reads: "The driver of every vehicle shall, consistent with the requirements of [§ 22(a), supra n. 3], drive at an appropriate re-

duced speed when approaching and crossing an intersection or railway grade crossing, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, and when special hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions." Because of the nature of the evidence, the Court gave the jury only a portion of the above section, namely: "The driver of every vehicle shall, consistent with the requirements of [§ 22(a)], drive at an appropriate reduced speed * * * when approaching and going around a curve, * * * when traveling upon any * * * winding roadway, and when special hazard exists with respect to pedestrians * * *."

curve may restrict the ability of a driver to avoid striking another vehicle or a pedestrian by swerving to one side or the other. Oncoming traffic is as hazardous in this respect to a vehicle approaching a curve as it is to a vehicle that has just passed the curve. Indeed, in the present case the combination of the curve and the southbound traffic, some of it straying over into the lanes that were legally northbound until 7:00 a. m., may well have been precisely the factors which combined with the defendant's negligence to cause the accident. The court therefore believes it was proper to let the jury consider the regulation dealing with curves and winding roadways along with all the other evidence in the case in deciding whether the defendant had been negligent.

■ 3. As far as certain statements made by plaintiff's attorney concerning damages are concerned, the defendant argues that the Court should have granted a mistrial when the plaintiff's attorney said to the jury in his closing argument that the plaintiff's special damages were not larger because of the plaintiff's impecunious circumstances, and that the attorney believed that the evidence justified a total verdict of $100,000.

The Court does not believe that the defendant was prejudiced by these remarks of the plaintiff's attorney. Immediately thereafter, the Court warned the jury to disregard the above remarks completely. Later, in its charge, the Court instructed the jury that the arguments and opinions of counsel do not constitute evidence. That such warning of the Court was heeded by the jury is indicated by the fact that the jury returned a verdict for $20,000, a modest sum when one considers that the plaintiff was out of work for an entire year and that his special damages alone, not including any amount for pain and suffering or for permanent injuries, totalled over $10,000. Therefore, even though this Court believes that the statements of plaintiff's attorney were improper,[9] the defendant was in no way prejudiced by such statements, and for this reason the motion for a mistrial was denied.

The defendant's motion for judgment notwithstanding the verdict, and in the alternative for a new trial, will therefore be denied.

9. The figure of $100,000 was, of course, the ad damnum clause of the complaint. This Court believes it highly improper for this figure ever to be told to the jury, even though in a particular case—such as the present one—no prejudice may result. Certainly the attorney should not be the one to mention any figure, either the ad damnum clause itself or his opinion of what the evidence suggests as a fair recovery. Any such statement is completely irrelevant, and conflicts with the rule of damages as the Court gives it to the jury, since it is the jury itself which must determine what is a fair and reasonable total amount. Furthermore, the mention of any single figure is apt to be prejudicial, since the figure is almost always inflated above the amount of a reasonable recovery and since the concreteness of an actual number is likely to stand out in the jurors' minds more than other arguments of counsel. Furthermore, it is difficult for a jury to refrain from reacting one way or another to the mention of such figure, since it is the first time that the jury would have heard a figure suggested for over-all recovery, as distinct from particular items of expense; and an award of over-all recovery is, after all, the jury's central task once liability has been determined. Thus the jury would be more alert to any mention of such a figure than they would be to less central arguments of counsel, and *some* reaction—either conscious or subconscious—is probable. Since there is no countervailing usefulness to mentioning such a figure, I believe it should not be mentioned, either by counsel or by court.

Our Court of Appeals has not yet decided whether an attorney should be permitted to mention the ad damnum clause. Nor has the Court of Appeals, in my view, decided that it is error for the trial judge himself to refuse to state the ad damnum. It is true that three decisions of our Court of Appeals have *permitted* the trial judge (statements of attorneys were not involved) to state to the jury the amount of the ad damnum as an amount beyond which the jury could not award a verdict. Washington & Georgetown R. R. Co. v. Hickey, 5 App.D.C. 436 (1895), aff'd on other grounds, 166 U.S. 521, 530–531, 17 S.Ct. 661, 41 L.Ed. 1101 (1897); McDermott v. Severe, 25

App.D.C. 276, 288 (1905), aff'd 202 U.S. 600, 612, 26 S.Ct. 709, 50 L.Ed. 1162 (1906); District of Columbia v. Duryee, 29 App.D.C. 327, 337 (1907). These cases were all decided at a time when it was the practice of District of Columbia courts to have the jury take the pleadings into the jury room during deliberations, Evening Star Newspaper Co. v. Gray, 179 A.2d 377, 381 (Mun.Ct.App. D.C.1962), and a cautionary warning by the judge would therefore have added nothing to what the jury would soon have before it in any event. Such practice no longer obtains, however; and a remittitur can take care of any award above the amount claimed. In any event, these Court of Appeals cases merely held that the trial court *could* properly state the ad damnum, despite objections by the defendant; they did not hold that it would be improper for the trial court to *refuse* to state the ad damnum, despite objections by the plaintiff. Thus it is my view that whether or not the trial judge instructs the jury on the ad damnum is, as the governing law now stands in this jurisdiction, a matter to be decided by the sound discretion of the trial judge himself. Melton v. Capital Transit Co., 102 U.S.App.D.C. 306, 253 F.2d 42 (1958), deals with the very different problem presented in the then Municipal Court when attorneys for defendant would argue that the fact that a United States District Judge had transferred the case to Municipal Court was evidence that the case was worth less than $3,000 (then the jurisdictional limit of that court for claims originally brought in that court.) Of course, in the face of such an improper argument, it was obviously proper for the Municipal Court judge not only to state that any opinion of the District judge on value was completely irrelevant, but also that the jury could, as the statute provided, award a sum up to the amount actually claimed for cases transferred from the District Court. These statements of the trial judge, in this context, Melton approved; but the Court of Appeals decided no larger issue. Thus I do not agree with the recent view of the then Municipal Court of Appeals that the Melton case, as a general proposition, "implied that the jury could be told of the ad damnum * * *." Evening Star Newspaper Co. v. Gray, supra, 179 A.2d at 381. The Court in Melton was dealing only with the very limited situation of how to correct the effects of an argument to the jury which improperly suggested that the jury could return a verdict of no more than $3,000.